ORIGINAL



FILED-USDC-NDTX-DA
'26 JAN 6 PM3:18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. 3:24-CR-049-S |
| AMIR MORTAZAVI (01) | |
| ROBERT LEISTEN (05) | **Supersedes Indictment returned on 02/21/2024** |
| AMY HAASE (06) | |
|  A/K/A AMY HAASE KERNE | **Related to Cause Nos. 3:18-CR-475-JJZ and** |
| ARNOLD FARBSTEIN (07) | **3:20-CR-384-N** |
| ERIC BERKMAN (09) | |
| JORGE CUZA (10) | |
| KATHREN MCCARTY (11) | |
| JAMES ELLIS (12) | |
| WALTER STRASH (13) | |
| DAVID WOLF (14) | |

SUPERSEDING INDICTMENT

The Grand Jury Charges:

Introduction

1.      Physicians, pharmacists, pharmacy marketers and pharmacy executives know and understand that pharmacies and their associated business entities cannot legally pay bribes and kickbacks to physicians in return for prescriptions fillable at those pharmacies.

Texas Commercial Bribery Statute

2.      Under Texas Penal Code Section 32.43, which outlaws commercial bribery, a physician owes a fiduciary duty to his or her patients and commits an offense if, without the consent of his or her patients, intentionally or knowingly solicits, accepts, or

**Indictment - Page 1 of 26**

agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the physician in relation to the affairs of his or her patients. Likewise, a non-physician violates the Texas Commercial Bribery Statute if he or she offers, confers, or agrees to confer any benefit, the acceptance of which by the physician is an offense.

Honest Services and the Physician-Patient Relationship

3.      Physicians owe a duty of honest services to their patients that includes the duty to refrain from accepting, or agreeing to accept, bribes and kickbacks offered in exchange for prescription referrals. Patients have a right to their physician's honest services for all decisions made for their medical care.

Overall Scheme

4.      Through various entities and individuals, pharmacies paid referring physicians in return for referring or directing profitable prescriptions to be filled at those pharmacies. This scheme resulted in pharmacies identifying profitable prescriptions; recruiting doctors to write those prescriptions; doctors referring prescriptions to those pharmacies in return for a share of the profits on those prescriptions; the pharmacies tracking each prescription by doctor by profit; and then pharmacies illegally paying the doctors through various business arrangements designed to conceal and disguise the nature of the payments.

Next Health (2013 – 2018)

5.     Next Health was a holding company that owned and controlled numerous other entities including pharmacies. Next Health previously operated as Business Partners in Health and later as Critical Healthcare Management. References to Next Health herein include all these entities as well as all of their dozens of associated business entities, including Next Health's pharmacies: COR, Total, Hilltree, The Apothecary Shop, and Parkwood, among others. References to Next Health refer to all these entities.

6.     Next Health was principally controlled by Andrew Hillman and Semyon Narosov, and they directed the activities of Next Health until at least July 2018.

7.     **Amir Mortazavi** held various leadership roles in Next Health, including Chief Business Development Officer, Chief Commercialization Officer, and Chief Executive Officer of Next Health Pharmacy.

8.     Arvin Zeinali held various leadership roles in Next Health, including Senior Vice-President of Pharmacy and President of Pharmacy.

9.     Vinson Woodlee, and his company, Med Left, LLC, initially acted as a marketer for Next Health. In some instances, Med Left would pay kickbacks directly to physicians or to someone in a close relationship with the physician. Later, Med Left operated several MSOs, more fully described below, which were used to funnel bribes and kickbacks from pharmacies to physicians. Unless otherwise noted, references to Woodlee or Med Left are used interchangeably herein.

10.     Next Health, through the efforts of, among others, Hillman, Narosov, **Mortazavi,** Zeinali, and Woodlee agreed to split profits with numerous physicians on their prescriptions filled at Next Health pharmacies.  The pharmacies would fill the prescriptions and then illegally kickback a portion of the profits from each prescription to the writing physicians.

Altus/Pharma Select (2017 – 2019)

11.     Beginning in 2017 and continuing into 2018, **Mortazavi,** Zeinali, Woodlee, and others moved a large share of Next Health's illegal pharmacy business to a related entity, referred to herein as Altus or Pharma Select.  Altus owned several pharmacies operating under different names, collectively referred to as  "Altus" or "Pharma Select."

12.     **Mortazavi** and Zeinali were sometimes referred to as co-CEOs (Chief Executive Officer) and shared offices in Dallas for an entity referred to as Community Pharmacy Partners.  Though **Mortazavi** was involved in the leadership of Altus, he instructed others that if anyone made inquiry, that "he is retired."

13.     Woodlee continued his role funneling bribe and kickback payments from Altus to physicians.  Woodlee operated several purported "Managed or Management Service Organizations" (MSOs).  Despite their name, these entities did not provide any real services.  Instead, Woodlee used these MSOs and Med Left to conceal bribes and kickbacks that Altus paid to referring physicians.

14.     Trinity Champion Healthcare Partners, LLC (Trinity Champion) was an MSO that was used to funnel bribes and kickbacks from pharmacies to physicians.

15.    Hexamed Business Solutions, LLC (Hexamed) was an MSO that was used to funnel bribes and kickbacks from pharmacies to physicians.

16.    **Robert Leisten** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Leisten** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. **Leisten** wrote prescriptions for his patients to multiple pharmacies including COR, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

17.    **Amy Haase** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Haase** owed a fiduciary duty to her patients under Texas law and owed her patients a duty of honest services. **Haase** wrote prescriptions for her patients to multiple pharmacies including COR, Hilltree, Parkwood, and Pharma Select that were tainted by illegal bribes and kickbacks.

18.    **Arnold Farbstein** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Farbstein** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. **Farbstein** wrote prescriptions for his patients to multiple pharmacies including Total, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

19.    Barry Weinstein was a licensed medical doctor who practiced medicine in Texas. As a physician, Weinstein owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. Weinstein wrote prescriptions for his

patients to multiple pharmacies including Total, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

20.    **Eric Berkman** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Berkman** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. **Berkman** wrote prescriptions for his patients to multiple pharmacies including COR, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

21.    **Jorge Cuza** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Cuza** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. **Cuza** wrote prescriptions for his patients to multiple pharmacies including COR, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

22.    **Kathren McCarty** was a licensed medical doctor who practiced medicine in Texas. As a physician, **McCarty** owed a fiduciary duty to her patients under Texas law and owed her patients a duty of honest services. **McCarty** wrote prescriptions for her patients to multiple pharmacies including The Apothecary Shop, Parkwood, and Pharma Select that were tainted by illegal bribes and kickbacks.

23.    **James Ellis** was a licensed medical doctor who practiced medicine in Texas. As a physician, **Ellis** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services. **Ellis** wrote prescriptions for his patients to

multiple pharmacies including Parkwood and Pharma Select, that were tainted by illegal bribes and kickbacks .

24.    **Walter Strash w**as a licensed medical doctor who practiced medicine in Texas.  As a physician, **Strash** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services.  **Strash** wrote prescriptions for his patients to multiple pharmacies including Total, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

25.    **David Wolf** was a licensed medical doctor who practiced medicine in Texas.  As a physician, **Wolf** owed a fiduciary duty to his patients under Texas law and owed his patients a duty of honest services.  **Wolf** wrote prescriptions for his patients to multiple pharmacies including Total, Hilltree, Parkwood, and Pharma Select, that were tainted by illegal bribes and kickbacks.

Count One
(Conspiracy)
(18 U.S.C. § 371)

26.    The grand jury re-alleges and incorporates by reference all preceding

paragraphs of this Superseding Indictment as if fully set forth herein.

27.    From on or about September 1, 2013, through at least October 2019, the

exact dates being unknown to the grand jury, in the Northern District of Texas and

elsewhere, defendants **Amir Mortazavi,** Arvin Zeinali, Trinity Champion Healthcare

Partners, LLC, Hexamed Business Solutions, LLC, **Robert Leisten, Amy Haase,**

**Arnold Farbstein,** Barry Weinstein, **Eric Berkman, Jorge Cuza, Kathren McCarty,**

**James Ellis, Walter Strash,** and **David Wolf,** knowingly and willfully conspired,

confederated, and agreed with Hillman, Narosov, Woodlee, and with each other, and with

others known and unknown to the Grand Jury, to commit offenses against the United

States, that is:

> a.  to violate 18 U.S.C. § 1952 (a)(1) and (a)(3); by using and causing to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, specifically, Commercial Bribery in violation of Texas Penal Code § 32.43, and, thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity; and

> b.  to violate 18 U.S.C. §§ 1343 and 1346; by knowingly and intentionally devising a scheme and artifice to defraud the patients of each indicted doctor of their right to his or her honest services as their physician and to transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice.

Purpose and Object of the Conspiracy

28.    It was a purpose and object of the conspiracy to illegally generate large sums of money for the defendants and their co-conspirators by exchanging concealed bribes and kickbacks for referrals of profitable prescriptions.

Manner and Means of the Conspiracy

29.    The manner and means by which the defendants and others sought to accomplish the object of the conspiracy included, among other things, the following:

a.    It was part of the conspiracy that, from on or about September 1, 2013, through on or about September 1, 2015, bribes and kickbacks were paid to referring physicians under the guise that the bribes and kickbacks were legitimate returns on investment from physician ownership in Class A pharmacies, including COR and Total. Next Health Class A pharmacies could generally be described as brick-and-mortar physical locations that were at least technically open to the public. In reality, (1) physician ownership required referrals, (2) ownership was offered for a nominal fee, (3) virtually 100% of pharmacy revenues were created by prescriptions written by physician owners, and (4) profits generated from the prescriptions were shared with the prescribing doctors. For example, **Leisten**, **Haase**, **Berkman,** and **Cuza** "purchased" a 1% ownership interest in COR Pharmacy for approximately $6,500 on or about September 1, 2013. Each physician made a substantial "return-on-investment" before the pharmacy was closed roughly two years later. These "return-on-investment" payments are sometimes referred to herein as the "Class A bribes and kickbacks."

**Indictment - Page 9 of 26**

b.      It was part of the conspiracy that, from on or about September 1, 2015, through on or about February 1, 2017, bribes and kickbacks were paid to referring physicians under the guise that the bribes and kickbacks were legitimate returns on investment from physician ownership in Class G pharmacies, including Hilltree.  Next Health Class G pharmacies could generally be described as call centers that referred the individual prescriptions to various Class A pharmacies.  In reality, (1) physician ownership required referrals, (2) ownership was offered for a nominal fee, (3) virtually 100% of pharmacy revenues were created by prescriptions written by physician owners, and (4) profits generated from the prescriptions were shared with the prescribing doctors. For example, **Leisten**, **Haase**, **Cuza, Farbstein,** Weinstein, **Berkman,** and **Wolf** "purchased" an approximate 1% ownership interest in Hilltree Pharmacy for approximately $1,000 (a 1.25% interest was $1,250, a 1.5% interest was $1,500, etc.). These Hilltree "investors" left Hilltree in or about February 2017 for a Woodlee MSO even though they had each made over a substantial return on their "investment" in less than two years.  These "return-on-investment" payments are sometimes referred to herein as the "Class G bribes and kickbacks."

c.      It was part of the conspiracy that, from in and about February 2017 into 2018, doctors who no longer wanted to be an invested physician in a Class G Pharmacy, or refused or were not offered a chance to buy-in, but yet still wanted to be paid by Next Health pharmacies for their prescription business, would send prescriptions to Parkwood. Parkwood pharmacy would track each prescription by doctor by profit, send the proceeds

to Med Left, and then Med Left would pay the doctors through various MSOs. At various times relevant to this indictment, **Leisten, Haase, Farbstein,** Weinstein, **Berkman, Cuza, McCarty, Ellis, Strash,** and **Wolf** sent prescriptions to Parkwood in return for receiving a share of the profits through various Med Left MSOs.

  d. It was part of the conspiracy that, from in or about February 2017 through in or about October 2019, bribes and kickbacks were paid to referring physicians under the guise that the bribes and kickbacks were legitimate returns on investment in MSOs. Generally speaking, the physicians would write prescriptions to Pharma Select; Pharma Select would fill the prescriptions and split net proceeds with the physicians. Since the pharmacies could not pay the physicians directly, the physician's share of the profits was funneled through multiple entities including MSOs. In reality, (1) physician ownership in MSOs required referrals, (2) ownership was offered for a nominal fee, (3) physician's individual shares in an MSO were based upon volume of referrals; and (4) 100% of MSO revenues were generated by prescriptions written by physician owners.

  e. **McCarty, Strash, Wolf,** and **Ellis** were "invested" physicians in several MSOs including Eagle Ridge Healthcare Partners, LLC, and Hexamed Business Solutions, LLC. Thus, in exchange for **McCarty, Strash, Wolf,** and **Ellis** referring prescriptions to Pharma Select: (i) Pharma Select funneled kickback payments to Med Left; (ii) Med Left paid Eagle Ridge and Hexamed; and (iii) Eagle Ridge and Hexamed paid **McCarty, Strash, Wolf,** and **Ellis.**

**Indictment - Page 11 of 26**

f.      **Leisten, Haase, Farbstein,** Weinstein, **Berkman**, and **Cuza** were paid through Trinity Champion Healthcare Partners, LLC.  Raintree Healthcare Partners, an entity controlled by **Leisten,** "owned" all the physician shares in Trinity Champion. Thus, in exchange for **Leisten, Haase, Farbstein,** Weinstein, **Berkman**, and **Cuza** referring prescriptions to Pharma Select: (i) Pharma Select funneled kickback payments to Med Left; (ii) Med Left paid Trinity Champion; (iii) Trinity Champion paid Raintree; and (iv) **Leisten** paid **Haase, Farbstein,** Weinstein, **Berkman, Cuza,** and himself from Raintree.

g.  All of these payments through MSOs are sometimes referred to herein as the "MSO bribes and kickbacks."

h.  It was part of the conspiracy that, from in or about 2014 to sometime in 2015, The Apothecary Shop paid a member of **McCarty's** household kickbacks and bribes for prescriptions written by **McCarty.**  From in or about 2015 to 2017, The Apothecary Shop or Parkwood paid Med Left for **McCarty's** prescriptions, and then Med Left paid the same household member the kickbacks and bribes for **McCarty's** prescriptions that were filled by Next Health pharmacies.  Likewise, it was a part of this conspiracy that in 2014 and in 2015 Next Health paid Med Left for **Strash's** prescriptions that were filled by Next Health pharmacies.  Med Left would then pay the kickbacks to **Strash** indirectly through known third parties.

f.  At all relevant times it was a part of this conspiracy that the prescriptions were submitted to Next Health and Altus pharmacies through electronic wire communications

including the use of facsimile machines.  The filled prescriptions were then usually

shipped by United States mail or interstate commercial carriers to the patients.  Next

Health and Altus used various means of electronic communications to bill private and

government pay insurance providers for these prescriptions.  Next Health and Altus then

distributed the funds generated by the scheme to invested physicians or intermediaries

through various electronic means including ACH deposits and, in some instances, paper

checks.

Overt Acts

30.    In furtherance of the conspiracy, and to accomplish its object and purposes,

**Mortazavi,** Zeinali, Trinity Champion, Hexamed, **Leisten, Haase, Farbstein,** Weinstein,

**Berkman, Cuza, McCarty, Ellis, Strash**, and **Wolf**, and other coconspirators,

committed and caused to be committed, in the Northern District of Texas and elsewhere,

the following overt acts, among others:

a.    On or about September 1, 2013, **Leisten, Berkman, Haase,** and

**Cuza,** purchased a 1% interest in COR Pharmacy for approximately $6,500.

b.    On or about December 2, 2013, an unindicted co-conspirator sent an

email to Next Health about COR Pharmacy distributions, copied **Leisten** and **Berkman**,

and, among things, stated, "**We want to  know what is going on with our business!"**

c.    On or about April 1, 2014, **Farbstein** purchased a 1% interest in

Total Pharmacy for $6,500.

d.      On or about May 17, 2014, COR Pharmacy made April's distribution payments to, among others, **Leisten, Berkman, Haase,** and **Cuza** in the amount of $20,539.58 each.

e.      On or about June 17, 2014, COR Pharmacy made May's distribution payments to, among others, **Leisten, Berkman, Haase,** and **Cuza** in the amount of $18.790.98 each.

f.      On or about July 30, 2014, **Berkman**, after a COR distribution check gets misplaced, had Next Health cancel his June check and instead electronically deposit it into an account controlled by **Berkman.**

g.      On or about August 1, 2014, Weinstein purchased a 1% interest in Total Pharmacy for $6,500.

h.      On September 18, 2014, **Mortazavi** signed a letter as President of COR Pharmacy and caused it to be sent to "invested" physicians.  In the letter, **Mortazavi** stated, among other things, "In the month of August, Cor Pharma, LLC generated $951,048 of net income.  During the month of August, the pharmacy filled 1,617 prescriptions, comprised of 530 refills and 1,087 new prescriptions. … With this distribution our partnership has realized a return on investment of 1878%."

i.      On or about November 6, 2014, Woodlee emailed Next Health and copied Hillman, Narosov, **Mortazavi** and Zeinali regarding sending blanket authorizations to all physicians at ROC and LOT.

j.    On or February 23, 2015, **Leisten** demanded to know from

**Mortazavi,** Woodlee, Hillman and two others, why the pharmacy was filling compound

prescriptions written by him and others using the "old" base instead of the "new" base –

which would have generated approximately $2,400 more in revenue on each prescription.

**Leisten** questioned whether this failure to produce (for the previous month) another

$2,534,110 in revenues was due to some doctors using old prescription pads or whether

the management of the pharmacies was lacking – the pharmacies were not paying

attention to detail and missing opportunities to maximize revenue.  **Mortazavi** responded

in writing to each of **Leisten's** concerns.

k.    On or about June 2, 2015, **Mortazavi,** Zeinali and Woodlee while

discussing, among other things, COR physician placement into Class G pharmacies,

**Mortazavi** stated, "I trust you guys to do this.  My suggestion is to group docs together

[t]hat will hold each other accountable. … I spoke to **Leisten**.  He needs to form his

POD of Md's so we can place them."

l.    On or about September 1, 2015, **Leisten, Haase, Farbstein,**

Weinstein, **Berkman, Cuza,** and **Wolf** purchased shares in Hilltree Pharmacy.  **Leisten**

and **Cuza** purchased a 1.5% interest for $1,500; **Haase, Farbstein,** and Weinstein

purchased 1% interest for $1,000; and **Berkman** and **Wolf**  purchased .5% interest for

$500.

m.      On or about February 16, 2016, **Berkman** emailed Next Health and inquired about whether there was a strategy in place to remove other "investors" if they only submitted a few prescriptions a month to Hilltree Pharmacy.

n.      On or about April 1, 2016, Next Health prepared a Summary of Schedule K-1 for Hilltree Pharmacy, LLC, for the tax year 2015. It showed distributions to the following individuals (among others) and in the following amounts: **Farbstein** - $59,885, Weinstein - $59,885, **Leisten** - $89,827, **Cuza** - $89,827, **Haase** - $59,885, **Berkman** - $28,341, and **Wolf** - $29,942.

o.      On or May 26, 2017, Parkwood prepared a report reflecting the status of prescriptions submitted and included the categories of "Filled," "On hold," "Cash," and "Grand Total" for, among other doctors, **Leisten, Haase, Farbstein,** Weinstein, **Berkman, Cuza, Ellis, Strash,** and **Wolf** filled.

p.      On or about August 16, 2017, Hillman and Narosov, according to a Next Health employee, agreed to pay Med Left a 60% commission on the prescriptions from **Leisten, Haase, Berkman, Cuza, Farbstein**, and Weinstein.

q.      On or about September 1, 2017, Altus agreed to pay 55% of net profits to **Leisten, Haase, Farbstein,** Weinstein, **Berkman, Cuza** for their prescriptions filled at Altus.

r.      On or about December 21, 2017, a Med Left employee prepared the November 2017 Summary Report for Eagle Ridge Healthcare Partners (precursor to

Hexamed) and informed **Ellis, McCarty, Strash** and **Wolf** that their distribution payments had been made.

s.    On or about January 2, 2018, an employee of Med Left sent a "12/01 – 12/29 Altus Report" to **McCarty** which informed her how many prescriptions she sent to the pharmacy (129), how many were filled (102), how many were new prescriptions (64), how many were refills (65), and her fill percentage (80%).

t.    On or about January 8, 2018, **Leisten** sent an email to a known individual seeking an Altus Pharmacy report that including "COGs, Amount paid and profit."

u.    On or about January 26, 2018, **Leisten** sent an email to a Med Left employee regarding the December payment to Trinity Champion. **Leisten** asked specifically, "When you report total income is $92041.58   (55%)  Does that mean Altus collected $167348.38 on our doctors?

v.    On or about January 31, 2018, a known Med Left employee walked **Leisten** through the financials for Trinity Champion for December 2017, informing **Leisten** that Altus received $331,342.35 from insurance companies for prescriptions filled there in December.  The cost to Altus to fill those prescriptions was $163,994.02 which was deducted from the total received, leaving a net collected number of $167,348.33.  The amount paid to Med Left is 55% of net proceeds [$92,041.58], and 100% of that money is paid from Med Left to the MSO.

w.   On or about February 6, 2018, **Leisten** emailed **Haase, Farbstein,** Weinstein, **Berkman,** and **Cuza** and informed them: "Beware of Bogus Script Pads - I have been informed today that our old "friends" at Parkwood Pharmacy are sending out new prescription pads to our offices in hope that we accidentally send them our prescriptions.  Please note that all our prescriptions should be faxed to Pharma-Select at 832 324-3993.  Let me know if you have any questions or concerns."

x.   On or about February 13, 2018, Med Left informed **McCarty** that she was being offered 25 shares in the new MSO – Hexamed.  Med Left would need her to sign some documents and send in her $2,500 for those shares – and that the last "off-cycle" distribution from the old MSO (Eagle Ridge) was being paid today and that it will offset this buy-in.  **McCarty** was further told that there will be a distribution from the new entity (Hexamed) before the end of the month and we "want to get our ducks in a row well before then …"

y.   On or about February 23, 2018, Med Left informed **Strash** that the summary report for the new entity Hexamed was completed and that **Strash's** distribution would be $3,271.62 "once we can officially activate the MSO."

z.   On or about April 23, 2018, Med Left finalized the March 2018 Summary Report for Hexamed and sent it to **Ellis, McCarty, Strash, Wolf**, and a known individual and informed them distributions were made today and will post tomorrow.

aa.   On or about May 2, 2018, a confidential human source (CHS) working with the FBI met with **Mortazavi** and Zeinali in Dallas in a recorded meeting.

The CHS informed **Mortazavi** and Zeinali that he represented a group of doctors that wanted to get paid on their prescriptions. **Mortazavi** and Zeinali informed the CHS that they would only agree to pay the doctors through Woodlee and his MSO model and then directed the CHS to meet with Woodlee.

        bb.    On or about May 10, 2018, the CHS met with Woodlee in San Antonio, Texas in a recorded meeting. Woodlee explained in detail how Woodlee, the CHS, and the doctors would get paid through the MSO model for the prescriptions they sent to Altus pharmacies.

        cc.    On or about May 22, 2018, **Zeinali**, **Leisten**, Weinstein, **Cuza,** Trinity Champion, and others known to the grand jury met at a dinner to discuss, among other things, switching their MSO structure, agreeing that all doctors in Trinity Champion would receive a weekly report for scripts submitted the previous week, and ensuring that each doctor had the latest "script pad."

        dd.    On or about August 27, 2018, a "MEDLEFT REPORT ONLY" spreadsheet was sent from Altus to Med left. It contained month-to-date prescriptions for among others, "Woodlee" doctors **Ellis, McCarthy, Stash, Wolf,** and "Woodlee1" doctors **Cuza, Farbstein, Haase, Leisten,** and Weinstein. The report tracked each doctor by patient, number of prescriptions filled, sum of monies due from insurance companies, sum of cost to fill each prescription, and sum of net.

        ee.    On or about August 29, 2018, in a series of emails, an unindicted co-conspirator paid through Trinity Champion and Raintree**,** questioned an employee of

Med Left about which prescriptions sent to Pharma Select were more profitable – creams or oral Naproxyn which is what that doctor had been prescribing for his patients. Ultimately, this unindicted co-conspirator concluded "no wonder I see these insane number of rx for some of the docs. I have been using a fair amount of the Naproxyn but will focus on the creams going forward."

        ff.     On or about October 11, 2018, an Altus employee sent a commission summary for the month of August to a Med Left employee. It reflected, among other things, that prescriptions from **Cuza,** Weinstein, **Haase, Berkman, Leisten** and **Farbstein** were paid 55% of net revenue on their prescriptions.

        gg.     On or about June 26, 2019, **Leisten** asked a Med Left employee "when can we expect the May report and funding?"

        hh.     On or about July 1, 2019, an employee of Altus sent a "MEDLEFT REPORT ONLY" spreadsheet to a Med Left employee. It contained June month-to-date prescriptions for among others, "Woodlee" doctors **McCarthy, Stash, Wolf,** and **Ellis,** and "Woodlee1" doctors **Cuza, Farbstein, Haase, Leisten,** and Weinstein. The report tracked each doctor by patient, number of prescriptions filled, sum of monies due from insurance companies, sum of cost to fill the prescription, and sum of net.

    All in violation of 18 U.S.C. § 371.

<u>Count Two</u>
Conspiracy to Commit Money Laundering
(Violation of 18 U.S.C. § 1956(h))

31.     All preceding paragraphs of this Superseding Indictment are realleged and
incorporated by reference as if set forth fully herein.

<u>The Conspiracy</u>

32.     From at least February of 2017 through at least October of 2019, in the
Northern District of Texas and elsewhere, the defendants **Amir Mortazavi,** Arvin
Zeinali, Trinity Champion Healthcare Partners, LLC, Hexamed Business Solutions, LLC,
**Robert Leisten, Amy Haase, Arnold Farbstein,** Barry Weinstein, **Eric Berkman,**
**Jorge Cuza, Kathren McCarty, James Ellis,** and **David Wolf** did knowingly combine,
conspire, and agree with Woodlee, with each other, and with other persons known and
unknown to the Grand Jury to commit offenses against the United States in violation of
Title 18, United States Code, Section 1956, to wit: to knowingly conduct and attempt to
conduct financial transactions affecting interstate commerce, which transactions involved
the proceeds of specified unlawful activity, that is,

> conspiracy to commit commercial bribery under Texas law and the Federal
> Travel Act as charged in Count One, conspiracy to commit wire fraud by
> deprivation of the intangible right of honest services as charged in Count
> One, and/or conspiracy to commit healthcare fraud in violation of 18
> U.S.C. §§ 1347 and 1349,

knowing that the transactions were designed in whole or in part to conceal and disguise
the nature, location, source, ownership, and control of the proceeds of specified unlawful
activity, and that while conducting and attempting to conduct such financial transactions,

knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

Introduction regarding Healthcare Fraud

33.    Optum RX, Prime Therapeutics, and CVS Caremark are pharmacy benefit managers (PBMs) that were contracted with United Healthcare, Blue Cross Blue Shield of Texas, and Aetna, respectively, to administer their pharmacy claims.  As such, Optum RX, Prime Therapeutics, and CVS Caremark were health care benefit programs affecting commerce as defined by 18 U.S.C. § 24(b).  In addition to these three named PBMs, several other PBMs also paid pharmacy claims to Next Health and Altus pharmacies.

34.    The PBMs enter into contracts with individual pharmacies directly or through pharmacy service administrative organizations (PSAOs).  This process allows independent pharmacies to access insurance customers whose pharmacy benefits are managed by the PBMs.

35.    The pharmacies understand that they are not allowed to pay bribes and kickbacks to physicians in return for the physician referring prescriptions to the pharmacies.  Further, if known to the PBMs, the PBMs would not pay pharmacies for filling prescriptions that were induced by bribes and kickbacks to the prescribing physicians.

## Purpose and Object of the Conspiracy

36.     It was a purpose and object of the conspiracy to conceal and disguise the nature and source of the large sums of proceeds generated by the defendants' collective efforts whereby the pharmacies agreed to split profits with prescribing doctors on profitable prescriptions.

## Manner And Means

37.     The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

a.     To disguise and conceal the source of the illegal bribes and kickbacks, the pharmacies could not and did not pay the kickbacks directly to the doctors. Instead, the defendants and others funneled the bribes and kickbacks to the doctors through various MSOs.

b.     Between 2017 and the end of 2019, Altus was reimbursed over $3 million dollars from PBMs for prescriptions illegally purchased from physicians. Altus paid Med Left, or a Med Left related entity, approximately 50% of profits from these prescriptions. Then Med Left paid the doctors through various MSOs.

c.     As relevant to this indictment, the net profits from prescriptions written by **Leisten, Haase, Farbstein,** Weinstein, **Berkman,** and **Cuza** were handled generally as follows:  roughly 45-50% of net profits were retained by Altus.  Altus would pay on a monthly basis, roughly 50-55% of net profits to Med Left.  Med Left would then take a significant percentage of this payment, sometimes as much as half, and pay the rest

to Trinity Champion.   Trinity Champion would then pay a small percentage to its managing partner and then pay the remaining proceeds to Raintree Healthcare Partners, LLC, an entity controlled by **Leisten**.  From there, **Leisten** would pay **Haase, Farbstein,** Weinstein, **Berkman,** and **Cuza**.

        d.     As relevant to this indictment, the net profits from prescriptions written by **McCarty, Ellis,** and **Wolf** were handled generally as follows:  roughly 50% of net profits were retained by Altus.  Altus would then pay roughly 50% net profits to Med Left.  Med Left would then take a significant percentage of this payment, sometimes as much as half, paying the remainder to one of several MSOs, including Eagle Ridge Healthcare Partners, LLC and Hexamed Business Solutions, LLC.  Hexamed, as well as Eagle Ridge, would then pay a small percentage to its managing partner, and then pay the remaining proceeds to **McCarty, Wolf,** and **Ellis**.

      All in violation of Title 18, United States Code, Section 1956(h).

Forfeiture Notice
(18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c))

38.    Upon conviction of any of the offenses alleged in Counts One or Two of this Superseding Indictment, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 981(a)(7) in conjunction with 28 U.S.C. § 2461(c), **Amir Mortazavi,** Arvin Zeinali, Trinity Champion Healthcare Partners, LLC, Hexamed Business Solutions, LLC, **Robert Leisten, Amy Haase, Arnold Farbstein,** Barry Weinstein, **Eric Berkman, Jorge Cuza, Kathren McCarty, James Ellis, Walter Strash,** and **David Wolf** shall forfeit to the United States of America all property constituting or derived from proceeds traceable to the respective offense, including a "money judgment" in the amount of U.S. currency constituting the proceeds traceable to the respective offense.

39.    Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendant (1) cannot be located upon the exercise of due diligence; (2) has been transferred or sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value; or (5) has been commingled with other property which cannot be divided without difficulty, the United States will seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

[Nothing follows on this page]

A TRUE BILL.

_____
FOREPERSON

RYAN RAYBOULD
UNITED STATES ATTORNEY

*Elise Aldendifer*
_____
CHAD E. MEACHAM
Assistant United States Attorney
Texas Bar No. 00784584
Email: chad.meacham@usdoj.gov
MARTY BASU
Assistant United States Attorney
Illinois Bar No. 6302360
Email: marty.basu@usdoj.gov
ELISE ALDENDIFER
Texas Bar No. 24124103
Email:  elise.aldendifer@usa.doj.gov
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Tel: (214) 659-8600
Fax: (214) 659-8809

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

AMIR MORTAZAVI  (01)
ROBERT LEISTEN  (05)
AMY HAASE  (06)
A/K/A AMY HAASE KERNE
ARNOLD FARBSTEIN  (07)
ERIC BERKMAN  (09)
JORGE CUZA  (10)
KATHREN MCCARTY  (11)
JAMES ELLIS (12)
WALTER STRASH  (13)
DAVID WOLF  (14)

---

SUPERSEDING INDICTMENT

18 U.S.C. § 371
Conspiracy
(Count 1)

18 U.S.C. § 1956(h)
Conspiracy to Commit Money Laundering
(Count 2)

18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c)
<u>Forfeiture Notice</u>

2 Counts

---

A true bill rendered

-----------------------------------------------------------------------------------------------------

DALLAS                                                                    FOREPERSON

Filed in open court this ___ day of January, 2026.

-----------------------------------------------------------------------------------------------------

**No Warrant Needed**

-----------------------------------------------------------------------------------------------------

UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending:  3:24-CR-049-S